# THE MICHIGAN NISI PRIUS·

## MAY, 1870.

JOHN CANFIELD AND EDMUND CANFIELD vs. THE BRIG CITY OF
ERIE.

A log boom in a navigable river is not, *per se*, a nuisance, but may be built and maintained.

The masters of vessels and managers of booms must each leave to the other all the space which the necessities of the case require.

The Circuit Court has jurisdiction in cases against vessels to recover damages for the breaking of booms and the consequent escape and loss of logs.

*Manistee Circuit, December, 1889.*

On the evening of the 4th of June, A. D. 1868, the brig City of Erie on entering the port of Manistee, in tow of the tug American Eagle, broke and entered the boom of the comcomplainant, situated on the south bank of Manistee river, carrying away a portion of the piles and lumber of the boom, whereby a portion of the logs stored therein escaped and were lost, etc.

The plaintiff claims that through the misconduct, negligence and want of skill and attention on the part of the master and employes of the brig and the unseaworthiness of her rudder, the brig was deflected from her due and proper course and turned into the boom, and that the master well knew of the defects in the rudder.

The defendants deny any want of care or skill on the part of of the persons in charge of the boat, &c.; and aver that the boat was engaged in transporting lumber from Manistee to Chicago, and was on her due and proper course at the time of the collision; that at the time of the alleged offense, the boom and logs extended to the middle of the river and unlawfully obstructed its navigation; that if there was any damage done by the brig, it was unavoidable and caused by the darkness of the night,

the action of the elements and the location of the boom and logs, which were so placed by the complainant as to seriously obstruct, hinder and damage the navigation of Manistee river and harbor, block up the channel and render it difficult and sometimes impossible for vessels to pass and repass as they otherwise might do, and that at this particular time there were other vessels and scows in the river and harbor, which increased the difficulty ; that the master and employes of the brig did all that could be done to avoid the collision or loss from it, and that if the complainants suffered loss or injury, it was entirely the result of their own wrong and illegal acts. That the Court has no jurisdiction of the caese, for the reason that the law under which it is brought is contrary to the Constitution and laws of the United States, and that the United States courts have exclusive jurisdiction in such causes of action.

*By the Court*, RAMSDELL, J.—The matter of jurisdiction having been submitted to the Court on stipulation, and a decision thereon rendered before the trial in favor of the jurisdiction of this Court, it is unnecessary to repeat that decision here ; therefore I shall proceed to an examination of the facts and circumstances set forth in the complaint, and answered and brought out by the evidence upon the trial.

Section 25 of the Act under which this suit is brought reads as follows :

" The trial or hearing shall be by the court without a jury, unless a jury be demanded by either party, by filing the demand five days before the time for which the notice shall have been given, and serving a notice of such demand upon the adverse party."

Neither party having demanded a jury as provided by this section, the case came up for hearing before the Court without a jury, partly upon depositions of witnesses taken before commissioners, and partly upon the oral testimony of witness in open Court

The first question to be considered is, did the brig City of Erie break and enter the boom of the complainants, as charged in the complaint ?

CANFIELD AND CANFIELD v. BRIG CITY OF ERIE.

The testimony of all the witnesses present on that occasion leaves no doubt upon this point.

The next question is, were the boom and logs wrongfully there ? If so, the accident was from the complainant's own wrong, and they cannot recover ; but if the boom and logs were lawfully there, then they are entitled to the same protection from the trespasses of passing vessels as any species of water-craft would be in a like lawful relation.

Waters like these are declared public highways, not for the particular benefit of A or B, who may chance to own a vessel, but because the necessities of commerce require it, and the whole country, as well as that in the immediate vicinity, is benefitted by it. It is a public necessity, and therefore a public right.

The same public necessity which declares these waters to be public highways, has induced the Supreme Court of this State to decide all the streams of this State capable of valuable floatage, public highways for that purpose. In the case of *Moore vs. Sanborn and others*, 2 *Mich.*, 519, Judge Martin, in giving the opinion of the Court, says : " This principle is one of vast importance to this and all new States. We have a large territory yet undeveloped, rich in forest and mineral wealth, washed by vast bodies of water upon three sides, and threaded by innumerable streams, which are capable of navigation, many of which are, and many others of which may be, made serviceable in developing its resources,—and with a commerce already established, rivaling in extent that of some of the Atlantic States, and rapidly growing under the influence of increasing population, settlement and wealth, it is of the first importance that the right of the public be recognized to the free use of all streams susceptible of valuable floatage. In this commerce our lumbering interests sustain and will continue to sustain an important part, and their success will depend to a vast if not entire extent, upon this principle. Indeed, a moment's reflection will convince us that a liberal application and retention of the common law rule and its adaptation to our condition and wants lies at the bottom of this branch of our trade. *   *

The servitude of the public interest depends rather upon the

purpose for which the public require the use of its streams than upon any particular mode of use, and hence, in a region where the principal busines is lumbering or the pursuit of any particular branch of manufacturing or trade, the public claim to a right of passage along its streams must depend upon their capacity for the use to which they can be made subservient. In one instance, perhaps, boats can only be used profitably from the nature of the product to be transported, whilst in another they would be utterly useless upon many of our streams, although of sufficient capacity for navigation by boats, they are never seen—whilst rafts of lumber of immense value, and mill logs which are counted by the thousands, are annually floated along them to market." These rights, as expressed by the Supreme Court, are based upon the public necessity and occasion for such use. This public right of floatage along our streams would be entirely valueless and unavailable without the further right to store or boom the logs along the river banks and in the natural harbors at their mouths. This further right follows as a corollary to the major proposition laid down by the Supreme Court in the case just cited, and is based upon the same principle.

This right and this necessity were recognized by the Legislature when it adopted Act No. 221 of the session laws of 1863. This statute establishes no new right so far as interfering with navigation upon our rivers is concerned, but is simply declaratory of a common-law right already existing and exercised—co-extensive with the right to navigate, and of equal public importance.

    *     *     *     *     *     *     *     *

Manufacturing and shipping interests are identical, and the interest of the public is equally with each. The true and only rule which can be given for the government of both interests is this : Each must leave to the other all the space which the necessities of the case require.