HEYWARD v. FARMERS' MINING COMPANY.

1. TITLE TO LAND—TRIAL.—In action to recover damages for trespass on land, and to enjoin further trespass, the complaint alleged that plaintiff was in possession and seized in fee. These allegations being denied, an issue of title was raised which was triable on the law side of the court.

2. IBID.—IBID.—PENDENCY OF ANOTHER ACTION.—The legal issue thus raised should have been docketed on Calendar 1 for trial by jury, and an order for another action to settle this issue was unnecessary. But such order having been passed, another action instituted, and no notice taken in such second action of defendant's plea of another action pending, error will not be declared in the failure to sustain defendant's plea where there was no evidence before the trial judge of the pendency of the former action, and no exception alleging error in the failure to pass upon it.

3. LAW CASE—FACTS—APPEAL.—In a law case tried by the judge with consent of the parties, the findings of fact in the Circuit Court cannot be reviewed on appeal.

4. DEED—SEAL.—A deed imperfect only for want of a seal will be regarded as a valid deed, where the seal was accidentally omitted.

5. COLOR OF TITLE.—In action for the recovery of real property, deeds and other papers, and possession thereunder, may be relied upon as color of title, where they show the extent of the occupant's claim.

6. RECOVERY OF REAL PROPERTY—PROOF OF TITLE—STATE AS PARTY.—The plaintiff having alleged that he was seized in fee, and the defendant having denied it, and the Circuit Judge having ordered a trial to determine the question of title, the plaintiff could not recover on proof of prior possession only, but was required to prove his title, especially so as the State was defendant.

7. STATE—PRESUMPTION—CHANGE OF PERIOD.—No presumption of a grant arose against the State prior to 1870, when, by the Code of Procedure, a grant would be presumed in such case after a lapse of forty years. Where one held possession prior to 1870, the currency of the presumption as against the State then started, and the presumption having commenced to run, the requisite period of time was not reduced by the subsequent act of 1873, changing the period in such cases to twenty years.

8. NAVIGABLE STREAMS.—To be navigable, a stream should have sufficient depth and width of water to float useful commerce, the test being navigable capacity, without regard to whether the surroundings are such as to make it presently useful for commerce. Therefore, where the trial judge ruled that a tidal creek was not a navigable stream of the State, because it ran up into a private estate and lost itself in the surrounding marsh, because it had never been used as a highway for commerce, and there

seemed to be no prospect of its ever being so used, and because it makes no connection with other highways, he erred in all of these rulings.

9. AN EXCEPTION based upon a misapprehension of the judge's ruling, overruled.

10. A QUESTION NOT RAISED nor passed upon on Circuit considered, as the case on other grounds would be again tried in the court below.

11. TIDAL NAVIGABLE STREAMS— GRANT—ESTOPPEL.—Under authority from the legislature to grant vacant lands, the officers of the State were not invested with power to grant the soil covered by tidal navigable streams, and, therefore, such a grant does not estop the State from afterwards asserting her right to such soil.

12. PETITION FOR REHEARING refused.


Before FRASER, J., Beaufort, February, 1893.


In this case the Honorable Eugene B. Gary, Associate Justice-elect of this court, sat, by special appointment, in the place of Mr. Justice Pope, who, when Attorney General, had been of counsel in the cause.

This was an action by W. M. Heyward against the Farmers' Mining Company, commenced November 17, 1891, on the following complaint:

The plaintiff, William Manigault Heyward, trustee, complaining of the defendant above named, the Farmers' Mining Company, alleges:

1. That at the times hereinafter stated, the plaintiff, William Manigault Heyward, trustee, was, and still is, the owner in fee simple, and in possession, of all that tract of land, situate, lying, and being in the County of Beaufort, State aforesaid, containing twenty-four hundred acres, more or less, butting and bounding to the north on lands of William Manigault Heyward, trustee; to the south on St. Helena Sound; to the east on Combahee River, and to the west on Bull River, having such marks, forms, and bounds as are represented by a certain plat annexed to a grant from the State of South Carolina to Christopher Williman, duly recorded in the office of Secretary of State of South Carolina.

II. That at the times hereinafter stated the defendant, the Farmers' Mining Company, was, and still is, a body corporate

under the laws of this State, having a capital stock of ten thousand dollars.

III. That on or about the 4th day of November, 1891, the said defendant, the Farmers' Mining Company, either by themselves or by their servants and agents, acting with their consent and by their direction and authority, entered unlawfully upon the premises described in the first paragraph of this complaint, the property of the plaintiff, and committed acts of trespass thereupon, to wit: by proceeding to dig and mine and remove from the said lands deposits of phosphate rock of great value, and although they (the said defendant) have been so mining only for the period of ten days, yet they have already dug therefrom about 400 tons, of the value of $2,800, and are continuing, notwithstanding the protest and warning of the plaintiff, to mine and remove from said lands said valuable phosphate deposits at the rate of about fifty tons per day.    That the injury so caused to this plaintiff is of an irremediable and continuing character; that their acts will be destructive to the very substance of the estate, and will tend to its ultimate destruction, the chief value of the property being on account of the deposits of phosphate rock thereon and therein contained, and that the capital of the defendant company being only ten thousand dollars, and its responsibility limited, it will be impossible for it to respond in damages in an action at law; and even in case of the recovery of judgment against the defendant corporation, the amount of damage which will accrue to the plaintiff before such action or actions can be brought and finally determined will be so large, that on a judgment and execution a recovery cannot be had and the money made, and that except by the intervention of this honorable court, irreparable loss and damage will accrue to the plaintiff.

IV. That the plaintiff believes that it is the settled and fixed purpose of the defendant, and their officers, agents, and servants, to continue their course of conduct as above outlined, and to repeat and continue the said trespasses upon the said property of the plaintiff, to the great detriment and damage of the plaintiff, and that the said defendant will, unless restrained by the order of this honorable court, continue such unlawful

acts and trespasses, and so continue to annoy and molest the plaintiff, and destroy the value of the property of the plaintiff, and that this course will also cause a multiplicity of suits against the said defendant.

V. That the plaintiff further alleges that he is powerless to stop this constant trespass and wrongs of the defendant by any suit or suits at law, on account of their being repeated so constantly and continuously. That incalculable and irremediable loss and damage will come to the plaintiff unless the defendant, its agents, servants, and attorneys, are restrained and enjoined from the commission of these wrongs; and that the capital of the defendant being only ten thousand dollars, and its means pecuniarily being small, the plaintiff has no adequate remedy at law, but that all these matters and things can be remedied only in a Court of Equity.

Wherefore, the plaintiff prays judgment that the defendant, its officers, agents, servants, and attorneys, be restrained and enjoined from proceeding to dig, mine, and remove, or either, any of the phosphate rock or phosphatic deposits from the lands described in this complaint, and that he may have such other and further relief as the nature of the case may demand and to the court seem meet.

On this complaint, duly verified, and an accompanying affidavit, Judge Wallace granted a temporary injunction, and required the defendant to show cause why the injunction should not be continued. The defendant made return on the day named, and Judge Wallace granted an order continuing the injunction, but required the plaintiff to "institute on the law side of the court such action as he may be advised by his counsel for the purpose of determining the question as to the title to the land described in the complaint." From this order there was no appeal, and no exceptions were filed.

Thereupon plaintiff filed his second complaint against the same defendant as follows:

The plaintiff, William Manigault Heyward, trustee, complaining of the defendant, the Farmers' Mining Company, a body corporate under the laws of said State, alleges:

I. That he, the plaintiff, William Manigault Heyward, trustee, is now, and was at the times hereinafter mentioned, seized in fee and in possession of the premises hereinafter described, to wit: All that tract of land, situate, lying, and being in the County of Beaufort, State aforesaid, containing 2,400 acres, more or less, butting and bounding on the north on lands of William Manigault Heyward, trustee; to the south on St. Helena Sound; to the east on Combahee River, and to the west on Bull River; the said tract of land having been granted to Christopher Williman by the State of South Carolina on the 4th day of September, 1786, said grant being recorded in Grant Book MMMM, page 316, of the office of Secretary of State of South Carolina, said land having such marks, forms, shapes, and bounds as are represented by a certain plat annexed to said grant and made a part thereof.

II. That the defendant, the Farmers' Mining Company, is now, and was at the times hereinafter mentioned, a body corporate under the laws of the State of South Carolina.

III. That on or about the 4th day of November, 1891, the defendant, the Farmers' Mining Company, either by themselves or by their servants and agents acting with their consent and by their direction and authority, forcibly broke and entered the plaintiff's said lands, and then and there dug and mined and removed from said lands (the property of the plaintiff) deposits of phosphate rock amounting to about 350 tons, of the value of $2,000, and converted and disposed of the same to their own use, and did commit and do other wrongs and enormities upon the said lands of the plaintiff, to the damage of the plaintiff $2,000.

Wherefore, the plaintiff demands judgment against the defendant for the sum of $2,000 and costs.

The answer of the defendants in this action was as follows:

The defendants, by Elliott & Townsend, their attorneys, answering the complaint herein:

First. For a first defence:

Allege that at the commencement of this action there was, and now is, another action pending in this court between the

same parties as this action, and for the same cause as that set forth in the complaint herein.

Second. For a second and further defence:

1. Say they have no knowledge or information sufficient to form a belief as to the truth of any of the allegations contained in the first paragraph of the complaint, and, therefore, deny each and every allegation contained in said paragraph.

2. Allege that, on the 7th day of November, A. D. 1891, under and in pursuance of the laws in such cases made and provided, the defendants, as the agents and licensees of the State of South Carolina, did, with their dredge and other apparatus used for mining and removing river phosphate rock and phosphatic deposits, enter Shingle Creek, in the county and State aforesaid, which is included within the boundaries of the lands mentioned in the complaint, but which is a navigable stream and the property of the State of South Carolina, and not the property of the plaintiff, and on the 9th day of said month defendants did commence to mine and remove phosphate rock and phosphatic deposits from the bed of said stream, below low water mark, and continued in possession thereof as the agent or licensee of the State of South Carolina.

3. Deny the allegations contained in the third paragraph of the complaint.

Thereafter, the State, on her own motion, was made a party, and she adopted the foregoing answer as her answer in the cause.

*Mr. Buchanan*, attorney general, and *Messrs. Elliott & Townsend*, for appellants.

*Messrs. W. H. Heyward* and *Mordecai & Gadsden*, contra.

July 27, 1894. The opinion of the court was delivered by

MR. JUSTICE GARY. The issues involved in this case will be understood by referring to the two complaints; the second answer of the Farmers' Mining Company, which was also adopted by the State as its answer when, upon petition, it was

made a party defendant; the judgment of the court below; appellants' exceptions; plaintiff's notice as to estoppel.

First exception. "That his honor erred in holding that this action is sufficient to test the title as contemplated by the order of Judge Wallace, directing plaintiff to institute an action on the law side of this court for the purpose of determining the question of title to the land described in the complaint; whereas, this action presents no issues not involved in the first action in which said order was made." The complaint alleges that the plaintiff is seized in fee, and, at the time therein alleged, was in possession of the premises described in the complaint. These allegations are denied by the defendants. This raises the question of title to the land, and is a compliance with the order of his honor, Judge Wallace, bearing upon this question, viz: "That within ten days from the signing of this order, the plaintiff do institute, on the law side of the court, such action as he may be advised by his counsel, for the purpose of determining the question as to the title to the land described in the complaint." Mr. Justice McGowan, in *Anderson* v. *Lynch*, 37 S. C., 575, says: "The Code of Procedure has made no material changes in the primary rights of parties, or in the different causes of action, nor undertaken to give any new redress; but has only changed the mode by which redress is reached and applied. It has provided what it calls 'an action for the recovery of real property,' in the place of the old action of trespass to try titles, which, as it is understood, embraces three elements, viz: the writ of right to try the title, ejectment to recover the possession, and, also, for mesne profits. See *Geiger* v. *Kaigler*, 15 S. C., 262. As we think, the action cannot be maintained unless there has been an actual trespass by the defendant. It is not absolutely necessary that the trespass should have been committed by the defendant himself in person, but it may be committed through and by another as an agent or tenant."

So much of this exception as complains that "this action presents no issues not involved in the first action in which said order was made," will be considered in connection with the second exception. This exception is overruled.

Second exception. "That his honor erred in not dismissing this action, there being another action at the time of the commencement of this action pending in this court, between the same parties, and involving the same issues." The first complaint embraced two causes of action—one was an action for the recovery of real property, and the other was an equitable action for injunction. *McMahan* v. *Dawkins*, 22 S. C., 314; *Dewalt* v. *Kinard*, 19 S. C., 292. The action set forth in the first complaint for the recovery of the land should have been placed on Calendar 1, and tried by a jury, unless a jury trial was waived; the equitable action should have been placed on Calendar 2, and tried by the judge sitting as a chancellor. There was no necessity for the order requiring the plaintiff to institute another action on the law side of the court for the purpose of determining the question as to the title to the land.

It has been urged as an objection to this exception that no appeal was taken from the order of Judge Wallace. The appeal from that order, however, could only be taken in the case in which it was made, and that case is not before this court. When the second action was instituted the defendants had the right to set up as a defence, that there was another action pending between the same parties for the same cause. It appears, however, that "at the hearing, the first defence set up in the answer was not brought up for the consideration of the court;" nor does it appear that the defendants introduced any testimony to sustain this defence. It was not considered by the Circuit Judge in rendering his judgment, and may have been considered by him as waived; but even if he had desired to consider it, we do not see any testimony upon which it could have been sustained. It is also questionable whether this exception can be considered by this court, as it does not complain of error on the part of the Circuit Judge in *failing* to consider a defence set up in the answer, as was done in the case of *Aultman* v. *Utsey*, 41 S. C., 305. This exception is overruled.

Third exception. "That his honor erred in holding that the plaintiff had sufficiently connected himself with the grant to Christopher Williman, dated 4th September, 1786." This in-

10—42

volves only a question of fact, which can not be reviewed by this court, as this is a law case. "So far as questions of fact, however, are concerned, this court could do nothing, even if such conclusions of fact should appear erroneous to us, for this court is without authority, as it has been repeatedly held in our decisions, to canvass such findings," &c. *Stepp* v. *National Association*, 37 S. C., 434. See, also, *Rhodes* v. *Russell*, 38 *Id.*, 424.

The Circuit Judge says: "The place on the creek at which the alleged trespass was committed is covered by the plat accompanying the grant from the State to Christopher Williman of 2,400 acres of marsh land. * * * I think the plaintiff has sufficiently connected himself with this grant. The only exception brought to my attention is that a deed from Christopher Williman, sr., to Christopher Williman, jr., wants a seal. It seems to me that under the ruling of the Supreme Court in *Trustees* v. *Bryson*, 34 S. C., p. 401, this deed is sufficient. The seal seems to have been, as in that case, accidentally omitted," &c. See, also, *Sullivan* v. *Latimer*, 38 S. C., 417. This exception is overruled.

Fourth exception. "That his honor erred in holding that land below high water mark was conveyed by said grant to Christopher Williman." The Circuit Judge found as a fact that the stream in which the land lies is not navigable, and the rule prevailing as to navigable streams can not be applied. Furthermore, this exception only involves a question of fact, which the court in this case can not review.

Fifth exception. "That his honor erred in holding that any of the papers or deeds introduced in evidence afforded 'color of title' to the marsh lands below high water mark." The Circuit Judge shows that the plaintiff relied upon deeds and possession of the land as color of title. The court, in *Duren* v. *Strait*, 16 S. C., 469, says: "In *Simmons* v. *Parsons*, 2 Hill, 492, color of title is defined to be 'any thing which shows the extent of the occupant's claim.'" This exception is overruled.

Sixth exception. "That his honor having found as matter of fact that at the places where the alleged trespasses were com-

mitted the tide ebbs and flows in and out from Coosaw River, and that the water there was seven feet deep at low water, and wide enough to float a dredge and barge carrying seventy-five tons of rock, he erred in not holding as matter of law that said place was the property of the State, no grant from the State conveying lands below high water mark on Coosaw River having been produced." The Circuit Judge could not have decided as contended in this exception, unless he had found as matter of fact, that where the alleged trespasses were committed, the stream was navigable. This exception questions a finding of fact by the Circuit Judge which can not be reviewed by this court. This exception is overruled.

Seventh exception. "That his honor erred in holding that plaintiff's mere possession of land covered by tide water was sufficient in an action against the State and its licensee to make it incumbent upon the defendants to prove title in order to justify their alleged trespasses on this possession." So much of the judgment of the court below as bears upon this exception is as follows: "When the alleged trespass was committed, the plaintiff was in possession, and I am not sure that it was necessary for the plaintiff to prove title at all. I am inclined to the opinion that when the plaintiff proved possession, it was incumbent on the defendant to prove title in order to justify the trespasses on the possession. I think, therefore, that plaintiff has a right to recover, unless that right is defeated by the better title of the defendant as lessees of the State, under the claim that these phosphate deposits are the property of the State, in the bed of a navigable stream or a navigable water."

The views expressed by the Circuit Judge are in conflict with the principle laid down in *Geiger* v. *Kaigler*, 15 S. C., 262, in which Mr. Justice McGowan says: "The action was brought, as stated, expressly to recover the land in dispute, upon the ground that the plaintiff had title to the same; and even if the old rule as to the necessity of proving title should now be held to be modified so as to allow a person, deprived of the possession of land, under proper allegations, to recover that possession without proof of title, it can have no application to this

case. Here *prior possession* cannot stand for the title, although it is an action in the form prescribed by the Code, and not technically trespass to try title under the statute. The plaintiffs staked themselves upon their title, and they must recover, if at all, upon the strength of this title." The order of Judge Wallace was, that the second action should be instituted for the purpose of determining the *title* to the land. The plaintiff having alleged that he was seized in fee, it was incumbent on him to prove the allegation. It must, also, be remembered that the *State* was one of the defendants, and had the right to stand upon its *prima facie* ownership of the soil. This exception is sustained.

Eighth exception. "That his honor erred in holding that the possession of the plaintiff, and those under whom he claims, was sufficient to presume a grant to land under high-water mark on a tidal stream, as against the State and its licensee." That part of the judgment of the court below bearing upon this exception, is as follows: "Besides, the plaintiff and those under whom he claims, have for many years been in possession under this deed or paper title, a time of itself sufficient to presume a grant, if none had appeared in the case, to all the land covered by this paper as color of title; and their possession has been such as this marsh land was *capable* of, and, therefore, sufficient." In the case of *State* v. *Pacific Guano Co.*, quoted with approval in *State* v. *Pinckney*, 22 S. C., 484, the court says: "Until 1870 the doctrine of *nullum tempus* prevailed in this State, and since that time twenty years have not elapsed, so that it is not necessary to consider the scope and effect of the new provision of the Code, as to when and under what circumstances the State will not sue."

The possession could not have begun to run against the State before 1870, when the Code was adopted. *State* v. *Arledge*, 1 Bail., 551. The period of time necessary to bar the right of the State, when the possession began to run against it in 1870, was forty years. In 1873 the period was changed to twenty years. The possession having begun to run against the State in 1870, when forty years was the period of time necessary to bar the right of the State, it was necessary for the possession to

continue for forty years in order to bar the right of the State, although the Code was amended in 1873 changing such time to twenty years.    This view is sustained by the case of *Rehkopf* v. *Kuhland*, 30 S. C., 238, in which Mr. Justice McIver, in delivering the opinion of the court, says: "The right of action against Apeler accrued when he took possession in 1871, at which time the statutory period was twenty years, and, as he held possession for only fourteen years, it is quite clear that he had not acquired a title by possession when he conveyed to the intestate, unless it be by virtue of the amendment of 1873, reducing the statutory period to ten years.    But the amendatory act contains no words giving it a retroactive effect, and, on the contrary, it is inserted as part of chapter II. of title 11 of the Code of Procedure, and must, therefore, be read in connection with the first section of that title, which expressly declares that 'the provisions of this title shall not extend to actions already commenced, or to causes where the right of action has already accrued, but the statutes then in force shall be applicable to such cases.'    Now, as in this case, the right of action had already accrued when the amendment was adopted, such amendment could not extend to this case, but the statute in force at the time the right of action accrued, which was twenty years, was applicable.    *Nichols* v. *Briggs*, 18 S. C., 473."    See, also, *Lyles* v. *Roach*, 30 S. C., 291.

The period of forty years not having elapsed, the State is not barred of its right, and the Circuit Judge was in error in applying the statute in this case.    In the language of Mr. Justice McGowan, in *State* v. *Pinckney:* "It surely cannot be that a requirement as to proof, originating in a statute of limitations and having exclusive reference to that, can be obligatory in a case to which the statute of limitations has no application as an act, somewhat in the nature of a declaratory law."    The section of the Code under which the plaintiff contends that the State is barred of its right to the land, is contained in chapter II., title 11, referred to by Mr. Justice McIver in the case of *Rekhopft* v. *Kuhland;* and the language of Mr. Justice McGowan was used in a case, where the attempt was made to interpose

this section to defeat the right of the State to the beds of her navigable streams.   This exception is sustained.

Ninth exception.   "That his honor erred in holding the business *done* upon a stream is the test of navigability."   Tenth exception.   "That his honor erred in holding that connection with another stream or highway is necessary to the navigability of a stream."   Eleventh exception. "That his honor erred in holding that the surroundings of a stream are a test of navigability."   Twelfth exception.   "That his honor erred in concluding and holding that a stream flowing up into a private estate can not be a navigable stream." These exceptions will be considered together.   The Circuit Judge says: "I propose to state my conclusions on this subject and my reasons for them as briefly as possible."   After quoting from certain authorities, he proceeds to lay down the rule by which to test the navigability of a stream, saying: "It seems to me also, in addition to what I have above said, that to be navigable, a stream should not only have sufficient depth and width of water to float useful commerce, but that the surroundings should be such that it may be useful for that purpose." He then proceeds to illustrate what he means by *surroundings:* "Now Shingle Creek flows up with the tide into the private estate of the plaintiff, which is a mere marsh, and loses itself in that marsh.   It has never been used as a highway for commerce of any sort, and there seems to be no prospect of its ever being so used; it makes no connection with any other highways. The only thing which looks like commerce is the capacity to float away the phosphate rock about which this litigation is carried on—it has been used for no other."

The doctrine of the common law that the navigability of a stream is to be determined by the ebb and flow of the tide, was repudiated in this State in the case of *State* v. *Pacific Guano Co.,* 22 S. C., 50.   If his honor had simply said, "that to be navigable, a stream should have sufficient depth and width of water to float useful commerce," without attaching other conditions, he would have stated correctly the doctrine prevailing in this State.   Judge Wallace, in his Circuit decree, which was affirmed on appeal in the case of the *State* v. *Pacific Guano Co.,*

says: "If a channel, therefore, in which the tide ebbs and flows, and in the language of the civil law, is floatable, can be used for the purpose of trade and commerce, it is a navigable stream. Neither the character of the craft nor the relative ease or difficulty of navigation, are tests of navigability." The Circuit Judge seems to have considered the *surroundings* of more importance in determining the navigability of a stream than its *depth*, as shown by the following from the judgment rendered by him (italics ours), to wit: "It is true, that at this point, Shingle Creek is *seven feet at low tide*. The *depth* of water in the two creeks referred to by Judge Wallace is not given, 'and seems to have been regarded as not very important, and is not given. It must have been sufficient for gathering phosphate rocks in the same manner as has been done in this case. In other respects, Shingle Creek is, in my view, just as Big Creek and Chisolm's Creek were. The only boat for any *useful* purpose ever employed in these waters was the boat and barge employed by the defendant in this case, one of which, it is said, carried *seventy-five tons* of phosphate rock."

The test is navigable *capacity*, and not that the *surroundings* should be such that it may be useful for the purpose of commerce. In discussing the surroundings enumerated by the Circuit Judge to determine the navigability of a stream, we will take them up separately. The first is: "Now Shingle Creek flows up with the tide into the private estate of the plaintiff, which is a mere marsh, and losses itself in that marsh." This condition relied upon by the Circuit Judge was mentioned by Lord Mansfield in the *Mayor of Lynn* v. *Turner*, 1 Cowp., 86, simply as a circumstance tending to show that the stream did not have navigable *capacity*, but not as a condition without which, though possessing navigable *capacity*, it could not be declared a navigable stream, as will be seen by the following language from that case: "How does it appear that this is a navigable river? The flowing and reflowing of the tide does not make it so, for there are many places into which the tide flows, which are not navigable rivers, and the place in question may be a creek in their own private estate."

The second condition enumerated by the Circuit Judge is:

"It has never been used as a highway for commerce of any sort, and there seems to be no prospect of its ever being so used." This makes *actual* use, and not navigable *capacity*, the test. The decisions hereinafter mentioned show that such a test would exclude many large rivers in undeveloped sections of the country. A stream may not be useful for commerce at one time, and yet circumstances may make it so. There are certain navigable streams in our State, which are very valuable on account of their phosphatic deposits. If the question of their navigability had come before the courts for adjudication before the phosphate rock in them was discovered, and the test laid down by the Circuit Judge had been applied, it would have resulted in the State being deprived of this valuable source of revenue, because they were not actually used at that time.

The third condition enumerated by the Circuit Judge is: "It makes no connections with other highways." This test has only been applied in cases where the question was whether a stream was a navigable water of the *United States.* There are certain conditions to be considered in determining the navigability of waters of the United States, so as to subject them to the laws of interstate commerce, that do not apply to navigable streams under the control of the State. Among these conditions is that mentioned by the Circuit Judge. In the case of *Daniel Ball,* 10 Wall., 557, the court, after speaking of the necessity of a rule on the subject of navigable streams in this country, different from that prevailing at common law, says: "A different test must, therefore, be applied to determine the navigability of our rivers, and that is found in their navigable capacity. Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are, or may be, conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States, within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition, by themselves, or by uniting with other waters, a continued highway

over which commerce is, or may be, carried on with other States or foreign countries, in the customary modes in which such commerce is conducted by water."

In discussing the rule laid down in the case just mentioned, the court, in *The Montello*, 11 Wall., 411, says: "It can only be deemed a navigable water of the United States when it forms by itself, or by its connection with other waters, such highway. * * * If, however, the river is not of itself a highway for commerce with other States or foreign countries, or does not form such highway by its own connection with other waters, and is only navigable between different places within the State, then it is not navigable water of the United States, but only a navigable water of the State." *The Montello*, 20 Wall., 430, says: "If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway. * * * The learned judge of the court below rested his decision against the navigability of the Fox River below the De Pere Rapids, chiefly on the ground that there were, before the river was improved, obstructions to an unbroken navigation. * * * Apart from this, however, the rule laid down by the district judge as a test of navigability cannot be adopted, for it would exclude many of the great rivers of the country, which were so interrupted by rapids as to require artificial means to enable them to be navigated without break. Indeed, there are but few of our fresh water rivers which did not originally present serious obstructions to an uninterrupted navigation. In some cases, like the Fox River, they may be so great while they last as to prevent the use of the best instrumentalities for carrying on commerce, but the vital and essential point is, whether the natural navigation of the river is such that it affords a channel for useful commerce. If this be so, the river is navigable in fact, although its navigation may be encompassed with difficulties by reason of natural barriers, such as rapids and sandbars."

In *Moore* v. *Sanborne*, 2 Mich., 519, the court says: "In this country the public right can not depend upon custom or general use; and we accordingly find in nearly all the States this

rule has been extended so as to be adapted to the necessities of our trade and commerce, and to embrace all streams upon which in their natural state there is capacity for valuable floatage, *irrespective of the fact of actual use, or the extent of such use.* Nor can the fact that a floatable stream has not been used by the public, or has only been ůsed by persons following a particular occupation, deprive such stream of its public character. This principle is one of vast importance to the interest of this and all new States."

*Brown* v. *Chadbourne*, 31 Me., 9, says: "If a stream could be subject to public servitude by long use only, many large rivers in newly settled States, and some in the interior of this State, would be altogether under the control and dominion of the owners of their beds, and the community would be deprived of the use of those rivers which nature has plainly declared to be public highways. The true test, therefore, to be applied in such cases is whether a stream is inherently, and in its nature, capable of being used for the purposes of commerce for the floating of vessels, boats, rafts, or logs."

*Hickok* v. *Hine*, 23 Ohio St., 523, says: "A river is regarded as navigable which is capable of floating to market the products of the country through which it passes, or upon which commerce may be conducted; and, from the fact of its being so navigable, it becomes in law, a public river or highway. The character of a river as such highway, is not so much determined by the frequency of its use for that purpose, as it is by its capacity of being used by the public for purposes of transportation and commerce."

*Diedrich* v. *Northwestern Railroad Co.*, 42 Wis., 248, says: "Waters are here held navigable, when capable of navigation in fact, without other condition. And when we use the terms navigable or unnavigable, we mean capable or incapable of actual navigation."

*Attorney General* v. *Woods*, 108 Mass., 436, says: "It is also denied that the stream is navigable, although it is about two feet deep at low water, because it is not proved to be used for the purposes of navigation, except with pleasure boats. The case of *Rowe* v. *Granite Bridge Co.*, 21 Pick., 344–347, is cited

to sustain this position.   Chief Justice Shaw there says: 'It is not every small creek in which a fishing skiff or gunning canoe can be made to float at high water, which is deemed navigable.    But in order to have this character, it must be navigable for some purpose useful to trade or agriculture.' But this language is applied to the capacity of the stream, and is not intended to be a strict enumeration of the uses to which it must be actually applied in order to give it that character. Navigable streams are highways; and a traveler for pleasure is as fully entitled to protection in using a public way, whether by land or water, as a traveler for business.   If water is navigable for pleasure boating, it must be regarded as navigable water, though no craft has ever been upon it for the purpose of trade or agriculture.   The purpose of the navigation is not the subject of inquiry, but the fact of the capacity of the water for use in navigation."   The case of *Rowe* v. *Granite Bridge Co.*, explained in the foregoing case, is one of those upon which the Circuit Judge based the test of navigability laid down by him; and it does not sustain said test.

The foregoing authorities show that the views expressed by the Circuit Judge are erroneous, and the test of navigability laid down by him can not be sustained.

Thirteenth exception.   "That his honor erred in concluding and holding that Shingle Creek is not a navigable stream from his findings of fact: that 'Shingle Creek flows up with the tide into the private estate of the plaintiff, which is a mere marsh, and loses itself in that marsh.   It has never been used as a highway for commerce of any sort, and there seems to be no prospect of its ever being so used; it makes no connection with any other highways.' "   Fourteenth exception. "That his honor erred in finding that Shingle Creek is a stream arising in a private estate, when the great preponderance of the evidence showed it was a navigable tidal salt water stream connecting two navigable streams, and is actually navigable." These exceptions only involve questions of fact, and, being a law case, will not be considered by this court, and are overruled.

Fifteenth exception.   "That his honor erred in not holding that even if said stream did not exist there at the time of the

original Williman plat and grant from Governor Moultrie, it subsequently existing, becoming navigable, and covering the land now its bed, made it a navigable stream, and, below high-water mark, the property of the State." This exception seems to have been taken under a misapprehension of what his honor, Judge Fraser, decided. He says: "Whatever changes may have occurred in these creeks and marshes in past geological epochs, and the very existance of these phosphate deposits shows that they have been great, in the absence of any evidence of changes in them in modern times, or in the absence of the actual present operation of any forces of nature which would have worked changes, near the date of this grant in 1786, I am bound to assume that Shingle Creek exists to-day in the same condition in which it was at the date of the grant, and the failure of the surveyor to note the creek on the plat is not sufficient evidence to the contrary." His honor did not hold that the stream had become navigable; on the contrary, he decided as matter of fact that it is not navigable. There is, therefore, no necessity for the application of the principles enunciated in *McCullough* v. *Wall*, 4 Rich., 83. This exception is overruled.

We now come to a consideration of the question of estoppel relied upon by the plaintiff. This question does not seem to have been made in the court below nor passed upon by the Circuit Judge. As the case must, however, be remanded for a new trial, and this question may be raised in the court below, we will not decline to consider it. The following is plaintiff's notice as to estoppel: "Please take notice that if an appeal to the Supreme Court is perfected in this cause, the plaintiff will insist that the decree herein be sustained, upon the ground that upon the evidence produced in this case, the State of South Carolina and her licensees are estopped from setting up any claim to the lands described in the complaint, if the Supreme Court should find itself unable to sustain the said decree on the grounds upon which it is rested by the Circuit Judge."

If the plaintiff can trace title back to a grant from the State to land covered by tidal though not navigable waters, the State

would be estopped by its grant. The principle, however, is different when the land granted is covered by navigable waters, as shown by Mr. Justice McGowan in *State* v. *Pacific Guano Co.*, to wit: "The absolute rule heretofore referred to, limiting land owners bounded by such streams to the high-water mark, unless altered by law or modified by custom, accords with the view that the beds of such channels below low-water mark are not held by the State simply as vacant lands, subject to grant to settlers in the usual way through the land office. There seems to be no doubt, however, that the State as such trustee has the power to dispose of these beds as she may think best for citizens; but not being, as it seems to us, subject to grant in the usual form, under the provisions of the statute regulating vacant lands, it would seem to follow, that in order to give effect to an alienation which the State might undertake to make, it would be necessary to have a special act of the legislature, expressing in terms and formally such intention." See, also, *Illinois Cen. R. R. Co.* v. *Illinois*, 146 U. S., 458, in which it is said: "A grant of all the lands under the navigable waters of a State, has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace. In the administration of government the use of such power may, for a limited period, be delegated to a municipality or other body, but there always remains with the State the right to revoke those powers, and exercise them in a more direct manner, and one more conformable to its wishes. So with trusts connected with public property, or property of a special character, like lands

under navigable waters, they can not be placed entirely beyond the direction and control of the State."

It is the judgment of this court, that the judgment of the court below be reversed, and that the case be remanded to that court for a new trial.

In this case a petition for a rehearing was filed, but it was refused by an order per curiam of September 13, 1894.