22602

STATE of South Carolina, ex rel. T. Travis MEDLOCK, Attorney General, Appellant v. The SOUTH CAROLINA COASTAL COUNCIL and C. E. Graham Reeves, Respondents, and The LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA and the League of Women Voters of Charleston County, Appellants v. The SOUTH CAROLINA COASTAL COUNCIL and C. E. Graham Reeves, Respondents.

(346 S. E. (2d) 716)

Supreme Court

*Atty. Gen. T. Travis Medlock* and *Sr. Asst. Atty. Gen. Kenneth P. Woodington,* Columbia, *for appellant State of S. C.*

*James S. Chandler, Jr.,* Columbia, *for appellant League of Women Voters.*

*Christopher M. Holmes,* and *Lucas C. Padgett, Jr.,* Charleston, *for respondent South Carolina Coastal Council.*

*Adams, Quackenbush, Herring & Stuart,* Columbia, and *Augustine T. Smythe,* Charleston, *for respondent C. E. Graham Reeves.*

Heard Oct. 21, 1985.

Decided July 28, 1986.

FINNEY, Justice:

This is an appeal from an order of the circuit court approving a decision by the South Carolina Coastal Council (Coastal Council) granting C. E. Graham Reeves a permit to impound six hundred sixty (660) acres of marshland at Annandale Plantation (Annandale) in the Santee River Delta area of Georgetown County. We reverse.

The appeal was initiated by the appellant, the South Carolina Attorney General, on behalf of the State of South Carolina. The appellants, League of Women Voters of Charleston County, and the respondent C. E. Graham Reeves intervened and the cases were consolidated in the lower court.

The appellants contend the permit unlawfully allows the blockage of navigable streams, and that Coastal Council exceeded its authority and violated its regulations by grant-

ing a permit to convert public trust tideland to private use.

On December 11, 1981, the Permitting Committee of the Coastal Council voted to issue Permit No. 81-5D-220 to allow C. E. Graham Reeves to impound 660 acres of wetland on his property at Annandale Plantation subject to the following special conditions:

(1) Provided that the applicant shall allow state and federal agencies to conduct mariculture experiments within the confines of the created impoundment.

(2) Provided that nothing in this permit shall affect the status of the title of the State or any person to any land below the mean high water mark. The State shall in no way be liable for any damage as a result of this proposed work.

This matter was appealed to the full Coastal Council. The hearing officer, who was authorized by Council to conduct a hearing, recommended that the permit be denied. The Coastal Council voted on November 19, 1982, to uphold the Permitting Committee's decision to grant the permit.

The permit will involve the total construction and reconstruction of 58,500 linear feet of embankments and the excavation of 104,000 cubic yards of material from the wetlands to create the embankments. 55,000 linear feet will be reconstructed on old embankments which previously existed on Minim Island, and 3,500 linear feet will be constructed on new embankments to enclose the 660 acres. This will result in the loss of approximately fifty (50) acres of marsh as it presently exists and will effectively remove the 660 acres in question from the existing unimpounded Santee Estuarine System. It was stipulated at the hearing that a portion of the area to be impounded is below the mean high water mark. The majority of the 660 acres to be impounded is regularly flooded by normal tidal action and is subject to diurnal tidal flushing.

The Santee River Estuarine System contains approximately 48,172 acres of coastal marsh. Approximately 19,837 acres of the Santee system is impounded, which represents forty-one (41%) percent of the system's total wetland. The impounded acreage in the Santee Delta is greater than any other estuarine system in the State. Tiner, *An Inventory of*

*South Carolina's Marshes.* Reeves' property, Annandale Plantation, comprises approximately 4,000 acres of which 1,200 acres are already impounded.

The scope of review of this Court is limited in actions by the Coastal Council. The substantial evidence standard for judicial review as stated in S. C. Code Ann. § 1-23-380(g) (1983 Supp.) is the proper standard for review of actions by the Coastal Council. *Carter v. S. C. Coastal Council,* 281 S. C. 201, 202, 314 S. E. (2d) 327 (1984); *Guerard v. Whitner,* 276 S. C. 521, 280 S. E. (2d) 539 (1981). The Court will not substitute its judgment for that of the Agency unless it is affected by error of law or clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. See S. C. Code Ann. § 1-23-380(g) (1985 Supp.); *Carter v. S. C. Coastal Council, supra.*

The appellants allege that this permit allows the construction of embankments which would block navigable streams in violation of Article XIV, Section 4, of the Constitution of the State of South Carolina.

Historically, Minim Island was used for the cultivation of rice, and canals and ditches were dug by earlier planters for the purpose of water control. Many of the ditches and canals are still in existence where the proposed impoundment is to be built, and they facilitate the movement of water and various organisms and organic material between the major natural creeks with which they connect and the marsh itself. These passageways are also used by the general public as natural watercourses to gain access to the interior of the island. The waterways have become the functional equivalent of natural streams. The evidence reveals the impoundments would block nine canals or ditches which are twenty (20) to fifty (50) feet wide at their mouths and can be navigated even during periods of low tide in outboard motor boats equipped with small to medium-size engines. In addition, fourteen other smaller waterways which are navigable only at periods of half to high tide would be blocked.

Article XIV, Section 4, of the Constitution of South Carolina states in part that "all navigable waters shall forever remain public highways free to the citizens of the State . . . and no . . . wharf [shall be] erected on the shores or in or over the waters of any navigable stream unless the same be authorized by the General Assembly." A navigable stream is

defined in S. C. Code Ann. § 49-1-10 (1976) to mean "[a]ll streams which have been rendered or can be rendered capable of being navigated by rafts of lumber or timber by the removal of accidental obstructions and all navigable watercourses and cuts are hereby declared navigable streams and such streams shall be common highways and forever free . . ."

Section 49-1-10 of the South Carolina Code does not change the definition of navigable waters, but merely emphasizes the law already declared and set out in *Heyward v. Farmers Mining Company*, 42 S. C. 138, 19 S. E. 963 (1894). The Court in *Heyward* rendered a thorough pronouncement of the law of navigability. As noted in *Heyward*, the common law doctrine that the navigability of a stream is to be determined by the ebb and flow of the tide was repudiated in South Carolina in the case of *State v. Pacific Guano Co.*, 22 S. C. 50 (1884).

The Court clarified in *Heyward v. Farmers Mining Company*, 19 S. E. at 971, that neither the character of the craft nor the relative ease or difficulty of navigation are tests of navigability. The surroundings (e.g. marshland) need not be such that it may be useful for the purpose of commerce nor that the stream is actually being so used. The Court points out a distinction between navigable waters of the United States and navigable waters of the State. In order to be navigable under the United States, the water must connect with other water highways so as to subject them to the laws of interstate commerce. This is not a requirement for navigability of waters under the control of the State.

The true test to be applied is whether a stream inherently and by its nature has the *capacity* for valuable floatage, irrespective of the fact of actual use or the extent of such use. *Heyward, supra.* Valuable floatage is not necessarily commercial floatage. The Court recognized a tendency of modern judicial thought that water is navigable which is of such character as to be of general use by the public for pleasure boating in *State v. Columbia Water Power Co.*, 82 S. C. 181, 63 S. E. 884, 888 (1909), but did not express any opinion regarding this trend. See also 65 C.J.S. *Navigable Waters*, § 6. It is important to note, however, the strong emphasis and protection afforded public boating. As

stated in *State v. Columbia Water Power*, 63 S. E. at 888, ". . . there cannot be the least doubt that the public is as much entitled to be protected in its use [of navigable waters] for floating pleasure boats as for any other purpose."

The use of this waterway by the general public for boating, hunting, and fishing is a legitimate and beneficial public use. It is our view that these waterways not only have the navigable capacity as required under *Heyward v. Farmers Mining Co., supra,* but they are navigable in fact as evidenced by their use by the general public. The Coastal Council does not have the authority to authorize the complete blockage of navigable streams and waterways, especially in a case such as this where there is no overriding public interest. See *cf. State v. Columbia Water Power Co.,* 90 S. C. 568, 74 S. E. 26, 27-28 (1911), and cases cited within.

The appellants also allege that the Coastal Council has violated its regulations and policies. Coastal Council Regulation 30-12(G)(1) recognizes that dredge and fill operations create adverse environmental impacts and for this reason, this section discourages these activities except in cases that are justified by a legitimate public need. When dredging is to be done for reasons other than "access, navigation, mining, or drainage," Coastal Council Regulation 30-12(G)(2)(g) states that a permit shall be denied unless an *overriding* public interest can be demonstrated. We find no overriding public interest in this case.

One of the stated purposes of the proposed impoundment is for the development of aquaculture. However, the evidence shows that this particular impoundment may only be minimally effective for aquaculture purposes and the benefit to the public tenuous. Further, the management plan submitted with the permit application, which is incorporated as part of the permit, only addresses the management of the impoundments as waterfowl habitat and does not specify a plan for the management of the impoundment for marine biological research and aquaculture. The principal purpose of the impoundment appears to be a commercial venture by the permittee Reeves to build an additional ten to twelve duck blinds in the impounded area which will be

leased on an annual basis of $1,000.00 per blind.[1] Although we recognize the potential benefit of an aquaculture industry to South Carolina, we cannot find sufficient evidence of an overriding public interest which would justify removing 660 acres from the Santee Estuarine System and destroying fifty acres of marshland.

Coastal Council Regulation 30-12(K)(2)(a) entitled, "Marsh Impoundments for Recreational and Commercial Activities," requires that impoundment of previously undisturbed saline and brackish marshes shall be denied unless an overriding public interest can be demonstrated. The 660 acres of tidelands which the permittee proposes to impound have over the years been manipulated by man. The effects of these manipulations have stabilized and at the present time, the area to be impounded is the functional equivalent of an undisturbed salt water marsh. As stated previously, we can find no overriding public interest in the construction of the new dikes contemplated by the permit.

In addition, Regulation 30-12(K)(2)(b) requires that permit applications for the rediking and embankment repair of former impoundments must include details describing intent and use as well as management plans which will be subject to Council review. The purpose stated in the permit was for aquaculture research, yet the management plan contains no details describing the proposed aquaculture project. The only detailed plan is in regard to the commercial waterfowl venture.

Based on the foregoing, we conclude the findings and conclusions of the Coastal Council, which were affirmed by the circuit court, are clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record and are affected by other errors of law. We reverse.

Reversed.

Ness, C. J., and Gregory, Harwell and Chandler, JJ., concur.

---

[1] Respondent C. E. Graham Reeves already maintains twenty-seven duck blinds leased for $1,000.00 each per year.