609 S.E.2d 811

**WHITE'S MILL COLONY, INC., Appellant/Respondent,**

**v.**

**Arthur WILLIAMS, Leonard Boseman, Jr., and Jerry Rouse, Respondents,**

**and**

**Leodel Mitchell, Jimmie Johnson, Leon Kelly, Lillian Davis and Richard Weeks, Respondents/Appellants.**

**No. 3923.**

Court of Appeals of South Carolina.

Heard Oct. 12, 2004.

Decided Jan. 18, 2005.

118

120

Kenneth R. Young, Jr., of Sumter, for Appellant/Respondent.

Arthur Williams and Jerry Rouse, both of Sumter, and Leonard Boseman, of Prince George, for Respondents.

A.P. Weissenstein, Jr., and James David Weeks, both of Sumter, for Respondents/Appellants.

KITTREDGE, J.:

In this appeal, we are asked to determine whether an owner of subaqueous land is entitled to exclusive use of a non-navigable body of water created by the owner's predecessor in title as against other, abutting property owners. Addressing this and other questions below, the special referee enjoined abutting landowners from making any use of the privately owned body of water. We affirm this ruling to the extent White's Mill Colony, Inc. (the "Colony") owns the subaqueous land, but vacate that portion of the judgment related to damages and remand the matter for determination of the precise property boundaries and, concomitantly, reconsideration of the damage awards.

## FACTS AND PROCEDURAL HISTORY

The parties are neighboring property owners whose land surrounds a pond. The core issue in this case is the question of who among these landowners has the right to access and use the pond. On one side of the pond is the Colony, which

claims its members have the right to exclusive use of the pond. On the other side of the pond are several individual property owners whose land abuts the pond (the "abutting landowners"). They claim they too have a right to access and use the pond. Briefly outlined below are the relevant facts concerning the pond, how the parties came into ownership of the land surrounding the pond and the pond bed, and the order of the special referee from which the present appeal arises.

## The Pond

At the center of this dispute is an eighty-eight acre body of water in Sumter County known as "White's Mill Pond." The pond is man made—created sometime in the late nineteenth century when a dam was constructed at the point where two streams converged, forming a third, larger stream. Neither the pond nor any of the incoming or outgoing streams are listed on maps of navigable waters prepared by the South Carolina Department of Health and Environmental Control. Testimony was presented from various witnesses describing the pond and the character of the surrounding area. From this evidence, it appears the pond is an essentially isolated body of water.

## Title to the Pond and the Present Dispute

Prior to 1950, title to the pond, including the pond bed, had been vested in the predecessors in title to the parties in this case. In 1955, the Colony obtained title to the land located to the north and east of the pond. The Colony also obtained title to the entirety of, or at least a substantial portion of, the bed of the pond itself. Land along the south and west sides of the pond subsequently came into the possession of the defendants in this case: Arthur Williams, Leonard Boseman, Jr., Jerry Rouse, Leodel Mitchell, Jimmie Johnson, Leon Kelly, Lillian Davis, and Richard Weeks. None of the deeds to these landowners granted any right of access to the pond. However, there is testimony suggesting some of the abutting landowners also have title to parts of the pond bed.

The Colony filed suit against the abutting landowners alleging some of them used White's Mill Pond in a variety of ways, including fishing, boating, dredging soil, removing trees from along the side of the pond, and building docks into the pond.

The abutting landowners counterclaimed, alleging their use and enjoyment of their property had been disturbed by the Colony. The matter was referred to a special referee for a determination of the parties' respective rights.

## The Special Referee's Order

In his order, the special referee determined the case turned on two key issues: first, whether White's Mill Pond is a navigable watercourse under South Carolina law giving rise to a *public* right of access to the pond; and, second, whether the abutting landowners held any *private* right to access and use the pond arising from their putative status as riparian or littoral owners. The special referee found neither right existed.[1] The abutting landowners were therefore enjoined from

---

1. The special referee also found as fact that "[t]he water in White's Mill Pond belongs to the State of South Carolina as do the fish contained therein." This finding is wholly incongruous with the express holding that the pond is not a navigable watercourse under South Carolina law to which the general public would enjoy a right of access. Though this finding is not explicitly appealed by either party, we conclude it would be inappropriate to bind the resolution of this matter based on this finding under the "law of the case" doctrine. *See Charleston Lumber Co., Inc. v. Miller Housing Corp.,* 338 S.C. 171, 175, 525 S.E.2d 869, 871 (2000) (stating an unappealed ruling is the law of the case).

 In construing a judge's order, we must do so in light of the judge's intent as discerned from the order as a whole. *See Weil v. Weil,* 299 S.C. 84, 90, 382 S.E.2d 471, 474 (Ct.App.1989) (holding that "[t]he determinative factor is the intent of the court, as gathered, not from an isolated part thereof, but from all the parts of the judgment itself. Hence, in construing a judgment, it should be examined and considered in its entirety"). Adhering to this principle, this court has refused to hold parties bound by language in a lower court order that we found was not necessary to the decision of the issues presented. *Id.* at 89, 382 S.E.2d at 473. (refusing to apply the "doctrine of the law of the case" to language found to be "mere dicta, an expression or statement by the court on a matter not necessarily involved in the case nor necessary to a decision thereof").

 Viewing the special referee's order as a whole, therefore, the finding that the water and fish of White's Mill Pond belong to the state stands as a non-sequitur in the otherwise coherent analysis. At the outset of his order, the special referee stated that the case turned on two issues— "whether White's Mill Pond is a navigable watercourse" and "whether the [abutting landowners] have riparian rights." The special referee's subsequent discussion of the applicable law only addresses these issues. No legal principle is cited or discussed in the order which supports a finding that the water and fish in the pond belong to the state. Indeed, when questioned by this court at oral argument, counsel for both

boating or fishing on White's Mill Pond, dredging or interfering with the pond's bed, cutting any timber from the bed of the pond, or building any structures on the bed of the pond, unless the structures were over property owned by the abutting landowners. Additionally, the special referee awarded damages against the various landowners in amounts ranging from $500 to $5,500.

It is important to note, however, that the referee did not make a determination as to the property lines. Despite contradictory evidence regarding the precise location of the line between the pond bed and the abutting landowners' property, the referee found that such determination was not necessary to address the questions presented.

The abutting landowners now appeal the special referee's findings that the pond is not a publicly accessible navigable waterway and that they have no right to access the pond as riparian or littoral owners. The Colony and several of the abutting property owners also appeal the special referee's award of damages.

## STANDARD OF REVIEW

"When legal and equitable actions are maintained in one suit, each retains its own identity as legal or equitable for purposes of the applicable standard of review on appeal." *Key Corporate Capital, Inc. v. County of Beaufort,* 360 S.C. 513, 516, 602 S.E.2d 104, 106 (Ct.App.2004) (quoting *Kiriakides v. Atlas Food Sys. & Servs., Inc.,* 338 S.C. 572, 580, 527 S.E.2d 371, 375 (Ct.App.2000)). In actions at equity, this court can find facts in accordance with its view of the preponderance of the evidence. *Id.; West v. Newberry Elec. Co-op.,* 357 S.C. 537, 542, 593 S.E.2d 500, 502 (Ct.App.2004). In an action at law, tried without a jury, the appellate court standard of review extends only to the correction of errors of law. *Id.; Okatie River, L.L.C. v. Southeastern Site Prep, L.L.C.,* 353 S.C. 327, 334, 577 S.E.2d 468, 472 (Ct.App.2003).

---

parties were unable to explain how this finding related to the special referee's explicit determinations. We are left with no choice, therefore, but to view this isolated language as an anomaly that is most probably the product of a labyrinthine factual and legal landscape rather than view it as a finding necessary to the referee's decision.

## LAW/ANALYSIS

In the discussion below, we address separately the three issues that determine this appeal: (I) whether White's Mill Pond is a navigable watercourse under South Carolina law; (II) whether the abutting landowners possess any riparian or littoral rights to access and use the pond; and (III) whether the special referee's award of damages was proper.

### I. Navigable Waters

■ The right of public access to navigable waters is guaranteed by our state constitution: "All navigable waters shall forever remain public highways free to the citizens of the State...." S.C. Const. art. XIV, § 4. South Carolina Code section 49–1–10 (1986) similarly provides that "[a]ll streams which have been rendered or can be rendered capable of being navigated by rafts of lumber or timber by the removal of accidental obstructions and all navigable watercourses and cuts are hereby declared navigable streams and such streams shall be common highways and forever free...." In upholding this constitutional and statutory mandate, our courts look to whether the waterway in question has the capacity to support "valuable floatage." If the waterway can support such use, it is deemed navigable and thus open to the public.

■ "Valuable floatage" is not determined by resort to generic guidelines as to what specific size or class of vessel or object can achieve buoyancy in the waterway. Rather, the term is defined broadly to include any "legitimate and beneficial public use." *Medlock v. South Carolina Coastal Council,* 289 S.C. 445, 450, 346 S.E.2d 716, 719 (1986). Such public use includes all varieties of commercial traffic, ranging from passage of the largest freighter to the floating of raw timber downstream to mill. *See id.* at 449, 346 S.E.2d at 719. Recreational uses are no less important—boating, hunting, and fishing have been found to fall within the ambit of valuable floatage. *See Hughes v. Nelson,* 303 S.C. 102, 105, 399 S.E.2d 24, 25 (Ct.App.1990). In this vein, considerations such as whether the waterway is natural or man-made or whether it is impassable by any vessel at certain times of year have been found to have no bearing on the question of navigability. *See State v. Head,* 330 S.C. 79, 90–91, 498·S.E.2d

389, 394–95 (Ct.App.1997). The focus remains strictly on capacity, irrespective of actual use.

■ Of course, not every body of water is "navigable." The concept of navigability encompasses more than the capacity to support valuable floatage in a single, secluded spot. Rather, to be properly categorized as navigable, the watercourse in question must also be connected to other navigable bodies of water such that it forms a means of transportation or conveyance beyond an isolated locality. This requirement of a navigable connection to a broader system of waterways has been at the heart of the navigability concept since its earliest application in this jurisdiction and others.

Beginning with the early cases addressing the public right to navigable waters in our state's jurisprudence, the express policy underlying that right was to protect, above all, the free flow of commerce. *See, e.g., State v. Columbia Water Power Co.*, 82 S.C. 181, 186, 63 S.E. 884, 887 (1909) (noting that "water is navigable when in its ordinary state it forms by itself or its connection with other waters a continued highway over which commerce is or may be carried"). Rivers and streams were essential means for conveying goods and raw materials from place to place. If private landowners had been able to prevent passage over their stream and river beds, the flow of commerce would have been seriously hindered, if not made impossible. Implicit, therefore, in this early concept of navigability is the requirement that the status of a body of water as navigable hinged upon its utility as a mode of transport for people and goods.

Though the definition of navigability has expanded to include recreational uses in addition to commercial ones, the need to demonstrate a connection beyond an isolated locus to other navigable waters remains. Otherwise, we confront the untenable result that any backyard pond would necessarily be navigable. Indeed, it would be difficult to imagine any body of water of noticeable size that would not be navigable and therefore subject to public use and enjoyment.

This common-sense approach to navigability is supported in our state's law. First, we note the proclamation of section 49–1–10 that all navigable streams shall remain forever free as "common highways" for all to use. This important language

leaves little doubt that the nub of the purpose behind leaving our navigable waterways open is to ensure citizens can move freely about the state without interference and without fear of being unavoidably subject to trespass actions by traveling on our waterways.

We also find support for this view in our case law. In a seminal case setting forth the modern test for navigability, *Heyward v. Farmers' Mining Co.*, our supreme court emphasized the primary policy objective that navigable waters remain open to ensure ease of travel, whether for commerce or recreation:

It is not every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable; but, in order to have this character, it must be navigable for some purpose useful to trade or agriculture. But this language is applied to the capacity of the stream, and is not intended to be a strict enumeration of the uses to which it must be actually applied in order to give it that character. Navigable streams are highways; and a traveler for pleasure is as fully entitled to protection in using a public way, whether by land or water, as a traveler for business.

42 S.C. 138, 155, 19 S.E. 963, 972 (1894).

More recently, in *State v. Head*, 330 S.C. 79, 498 S.E.2d 389 (Ct.App.1997), the court examined whether a 246 acre lake was navigable. In that criminal trespass action, the court considered whether a fisherman was entitled to access the lake. The State argued the lake was not navigable because it was sealed off from any other navigable waters. *Id.* at 91, 498 S.E.2d at 395. We rejected that argument under the specific facts of the case because the lake in question was separated from other navigable waters by a dam, an obstruction our courts have held does not render a waterway non-navigable. *Id.* at 90–91, 498 S.E.2d at 394–95 (citing *State ex rel. Guste v. Two O'Clock Bayou Land Co.*, 365 So.2d 1174 (La.App.1978); 65 C.J.S. *Navigable Waters* § 5(3) (1966)). In our analysis, however, we recognized and distinguished from the facts of *Head* the rule that a small inland lake having no navigable outlet is not navigable. *Id.* at 91 fn. 3, 498 S.E.2d at 395 fn. 3.

Indeed, other jurisdictions have declined to extend the reach of navigability to isolated inland lakes and ponds. For example, in *Lakeside Park Co. v. Forsmark*, 396 Pa. 389, 153 A.2d 486 (1959), the Pennsylvania Supreme Court addressed whether a nearly 150 acre lake with no outlet was navigable. Applying a standard for determining navigability similar to our own, the court found the lake was not navigable, opining:

> We think that the concept of navigability should not be limited alone by lake or river, or by commercial use, or by the size of water or its capacity to float a boat. Rather it should depend upon whether water is used or usable as a broad highroad for commerce and the transport in quantity of goods and people, which is the rule naturally applicable to rivers and to large lakes, or whether with all of the mentioned factors counted in the water remains a local focus of attraction, which is the rule sensibly applicable to shallow streams and to small lakes and ponds. The basic difference is that between a trade-route and a point of interest. The first is a public use and the second private.

*Id.* at 489; *see also, e.g., Adirondack League Club, Inc. v. Sierra Club*, 92 N.Y.2d 591, 684 N.Y.S.2d 168, 706 N.E.2d 1192, 1195 (1998) (holding that "the central premise of the common-law rule remains the same—in order to be navigable-in-fact, a river must provide practical utility to the public as a means for transportation. Thus, while the purpose or type of use remains important, of paramount concern is the capacity of the river for transport, whether for trade or travel.").

After thoroughly canvassing the record before us, we find no evidence to suggest White's Mill Pond serves any useful purpose for transport or travel—whether for commerce or recreation—beyond the immediate perimeter of its banks. The testimony of Richard Wheeler, a South Carolina Department of Natural Resources officer, indicates the streams flowing into and out of the pond are not capable of supporting valuable floatage. Furthermore, this testimony is bolstered by that of a member of the Colony who testified he had personally walked up and down the incoming and outgoing streams and they were non-navigable. Therefore, we conclude the special referee correctly determined White's Mill Pond is not a navigable waterway under South Carolina law.

Accordingly, the pond is not subject to a general right of the public to access its waters.

## II. Riparian or Littoral Rights

■ Having found there is no right of the general public to access White's Mill Pond as a navigable watercourse, we must next decide whether the abutting landowners have any independent riparian or littoral property rights to access the pond. These landowners claim they have such rights to access and make reasonable use of the pond. The Colony, on the other hand, claims its purported ownership of the entire bed of the pond entitles it to exclusive control over the use of the pond's surface waters.

■ Under the common law, owners of land along rivers, streams, lakes and other bodies of water possess a property right incident to their ownership of the bank and bed of a watercourse that is distinct from those rights that may be enjoyed by the public at large. In general, these special rights allow abutting landowners to make "reasonable use" of the body of water for any lawful purpose, whether for commerce or recreation. *Lowe v. Ottaray Mills,* 93 S.C. 420, 421–22, 77 S.E. 135, 136 (1913). These rights are subject to the limitation that the use may not interfere with the like rights of those above, below, or on the opposite shore. *See Mason v. Apalache Mills,* 81 S.C. 554, 559, 62 S.E. 399, 401 (1908). With regard to these rights, there is a distinction in classification that our courts have indicated a desire to strictly observe: owners of land along rivers and streams are said to hold "riparian" rights, while owners of land abutting oceans, seas, or lakes, are said to hold "littoral" rights.[2] Because White's Mill Pond falls into the latter category, our discussion will address whether the abutting landowners possess any "littoral" rights.

---

2. See *Lowcountry Open Land Trust v. State,* 347 S.C. 96, 108, 552 S.E.2d 778, 785 (Ct.App.2001) (noting that "[Riparian] is sometimes used as relating to the shore of the sea or other tidal water, or of a lake or other considerable body of water not having the character of a watercourse. But this is not accurate. The proper word to be employed in such connections is 'littoral.' ") (quoting Black's Law Dictionary 1327 (6th ed.1990)).

Though our state has recognized the general right of access enjoyed by littoral property owners, the question presented in this case regarding who may control the surface waters of a private, man-made, non-navigable pond, when the pond bed is owned entirely by an adjoining landowner has not been addressed by our courts. *See generally, Lowcountry Open Land Trust v. State,* 347 S.C. 96, 109, 552 S.E.2d 778, 785 (Ct.App.2001) (opining that "[t]he extent of littoral rights in this jurisdiction is an unanswered question"). Therefore, we first resort to the law of other states to understand whether littoral rights obtain in these circumstances.

Canvassing the case law in this area, it appears two views have emerged on this issue: one is generally termed the "common law rule," while the other is known as the "civil law rule."

Under the common law rule, "the owners of the fee in land underlying the surface waters of a man-made, nonnavigable lake are entitled to the exclusive control of that portion of the lake lying over the land as to which they own the fee." *Wehby v. Turpin,* 710 So.2d 1243, 1247 (Ala.1998). Consequently, owners of all or part of a pond or lake bed have the right to exclude others from accessing or using the surface waters above their property.

A seminal case, cited repeatedly across jurisdictions as a thoughtful application of the common law rule, is *Anderson v. Bell,* 433 So.2d 1202 (Fla.1983). The facts of *Anderson* are similar to the circumstances surrounding the present dispute over White's Mill Pond. In that case, the plaintiff, Anderson, purchased a tract of land traversed by a small, non-navigable creek. He later excavated the low-lying areas of the property and constructed an earthen dam. This damming resulted in the creation of a "substantial" lake that partially flooded several adjoining parcels. Two of the neighboring property owners whose land had been flooded, Lewis and Watson, sued Anderson for the damage caused to their property. A settlement agreement was reached whereby Lewis and Watson conveyed to Anderson a flowage easement that allowed Anderson the right and privilege to flood their land. The easement, however, expressly reserved to Lewis and Watson the title and beneficial use of their land. Lewis and Watson

later sold their property to Bell. Anderson brought action to enjoin Bell from fishing and boating upon the surface waters above the bottom land owned by Anderson. *Id.* at 1202–1203. The Florida Supreme Court found Bell could be excluded from the surface waters above Anderson's property, holding:

> the owner of property that lies adjacent to or beneath a *man-made, non-navigable* water body is not entitled to the beneficial use of the surface waters of the entire water body by sole virtue of the fact that he/she owns contiguous lands .... this is the established rule in other jurisdictions as well as the common law.

*Id.* at 1204 (emphasis in original). The *Anderson* court opined that its decision to follow the common law rule was rooted in the recognition that "a lake developer's expectations in his investment" must be preserved:

> Because the construction of a man-made water body often involves the expenditure of substantial sums of money and the expense is not, as a rule, divided proportionately among the various abutting owners, the individual making the expenditure is justified in expecting that superior privileges will inure to him in return for his investment.

*Id.* at 1205. The court therefore concluded that:

> [W]e believe a contrary rule may serve to dissuade Florida homeowners and investors from making improvements that not only increase property values but also aesthetically improve adjacent lands, since they would run the risk of losing some of their property rights to other people merely because the water body touches another's property. In the event that the water happens to take a course that would result in the flowage over public lands, the entire water body would become accessible to numerous piscators, bathers and boaters, thereby destroying the property owners' investment benefits.

*Id.* at 1205–1206. The common law rule has been adopted by numerous other state appellate courts, including courts in Alabama, Indiana, Georgia, Mississippi, Virginia, and New Jersey, and which is acknowledged in at least two states as the majority rule. *See, e.g., Wehby v. Turpin,* 710 So.2d 1243, 1249 (Ala.1998) (deciding that "[w]e are bound to follow the *majority* common law rule ... and hold that the owners of

land extending beneath artificial or man-made lakes, not navigable as a matter of law, have surface-water rights only in the surface waters above their land") (emphasis added); *Berger Farms, Inc. v. Estes*, 662 N.E.2d 654, 656 (Ind.Ct.App.1996) (holding that "[i]t is well established that the owner of land, upon which there is located a nonnavigable lake, owns and has the right to control the surface of the lake"); *Lanier v. Ocean Pond Fishing Club, Inc.*, 253 Ga. 549, 322 S.E.2d 494, 496 (1984) (holding that "Georgia follows the common law rule ... that the owner of a bed of a nonnavigable lake has the exclusive right to the use of the surface of the waters above and may exclude other bed owners and fence off his portion"); *Black v. Williams*, 417. So.2d 911, 912 (1982) (following "the *majority* rule ... that owners of the fee in the land beneath [an artificial or man-made] lake, in the absence of some statute or covenant or agreement to the contrary, have exclusive control over the water over their respective portions") (emphasis added); *Wickouski v. Swift*, 203 Va. 467, 124 S.E.2d 892, 895 (1962) (holding that "control of the water above the land is an incident to the ownership of the land," entitling property owners to "exclusive control and use of the waters above their portion of the bed of the pond"); *Baker v. Normanoch Assn., Inc.*, 25 N.J. 407, 136 A.2d 645 (1957) (holding that "[t]he rule in [New Jersey] is that the general public [has] no rights to the recreational use of a private lake, such rights being exclusive in the owner of the bed...."). Some treatises have also referenced the common law rule as the predominant view. *See, e.g.*, 78 Am.Jur.2d *Waters* § 37 (2002) (commenting that "the general rule is that riparian rights do not ordinarily attach to artificial water bodies or streams.... The owner of property that lies adjacent to or beneath a manmade, nonnavigable water body is not entitled to the beneficial use of the surface waters of the entire water body by the sole virtue of the fact that he or she owns contiguous lands."); C.C. Marvel, Annotation, *Rights of Fishing, Boating, Bathing, or the Like in Inland Lakes*, 57 A.L.R.2d 569 (Supp.2003) (noting that "[i]t has been held or recognized that there are no riparian rights of fishing, boating, bathing, or the like, as the case may be, in a lake the bed of which is owned by one other than the riparian owner").

Under the "civil law rule" adopted by other jurisdictions, an owner of land contiguous to a lake or pond is, purely by virtue of littoral rights, entitled to the reasonable use and enjoyment of the entire body of water—whether navigable or not. *See Johnson v. Seifert,* 257 Minn. 159, 100 N.W.2d 689, 696–97 (1960) (expressly rejecting the common law rule and holding that an "abutting or riparian owner of a lake . . . has a right to make such use of the lake over its entire surface, in common with all other abutting owners . . . regardless of the navigable or public character of the lake and regardless of the ownership of the bed thereof"). States applying the civil law rule emphasize the importance of promoting the beneficial use and enjoyment of lakes and ponds as a recreational resource. *See, e.g., id.* at 695 (opining that "states which like Minnesota have extensive waters of recreational or commercial value hold that an abutting or riparian owner has a right of reasonable use of the entire overlying water, and no distinction is made between navigable and nonnavigable, meandered or unmeandered, or public or private lakes").

A recent application of the civil law rule may be found in *Ace Equipment Sales, Inc. v. Buccino,* 82 Conn.App. 573, 848 A.2d 474 (2004). The material facts of *Ace Equipment* largely mirror those of the present case. At the center of that case was a twenty acre non-navigable, man-made pond surrounded by several parcels of property held by various owners. The pond bed was owned entirely by one of the abutting property owners, who sought to exclude the other adjoining landowners from any access to the pond waters. *Id.* at 476–77. The court concluded that "owners of subaqueous land under a pond or lake may not prevent the use, by abutting owners, who control the existence of the pond itself, for recreational purposes of the surface water above the bed of a pond that they own." *Id.* at 480.[3]

Based on our review of these cases, we follow the common law rule as set out above. First, we note that, as a general rule, South Carolina law in the area of water rights generally hews closely to the common law. *See, e.g., Lowcountry Open*

---

**3.** *But see Ace Equip. Sales,* 848 A.2d at 482–85 (Schaller, J., dissenting) (One member of the appellate panel forcefully argued in dissent that the common law rule should be followed in Connecticut).

*Land Trust,* 347 S.C. at 110, 552 S.E.2d at 785–86 (adopting common law rule regarding the ability of riparian owners to wharf over navigable waters); *Horry County v. Woodward,* 282 S.C. 366, 369–70, 318 S.E.2d 584, 586 (Ct.App.1984) (recognizing "the general common law rule that accretions by a natural alluvial action to riparian or littoral lands become the property of the riparian or littoral owner whose lands are added to"); *McCullough v. Wall,* 38 S.C.L. (4 Rich.) 68, 86 (1850) (adopting and applying the common law rule that the owner of the soil over which a non-navigable stream or river flows has the exclusive right of fishing unless some other person can show a grant or prescription in "derogation of the right naturally attached to the ownership of the soil"); *see also* S.C.Code Ann. § 14-1-50 (1976) (providing that "[a]ll, and every part, of the common law of England, where it is not altered by the Code or inconsistent with the Constitution or laws of this State, is hereby continued in full force and effect in the same manner as before the adoption of this section"). Therefore, we think that, when confronted with a decision whether to follow a common law approach or follow a civil law rule, our courts—absent any other considerations—would generally follow the common law rule.

Second, we think the underlying policy of protecting the financial investments and expectations of individuals who make capital improvements to their property—a policy compellingly articulated in *Anderson v. Bell* and other cases adopting the common law rule—is in accord with the general jurisprudence of our state.[4] Property owners should be able make improvements to their real property without fear that their investment will be diminished should they create a body of water that touches upon the property line of a neighboring landowner. Of course, neighboring property owners are not foreclosed from gaining access to an abutting non-navigable, man-made body of water. Any such abutting property owner

---

4. A prominent example of an area of property law where the courts give substantial consideration to a property owners' financial investment in their property is in the field of the government's power of eminent domain. When analyzing whether the government has effected a compensable taking of private land for public use, a key factor the court must consider is the property owner's "reasonable investment-backed expectations." *McQueen v. South Carolina Coastal Council,* 354 S.C. 142, 148, 580 S.E.2d 116, 119 (2003).

is free to bargain with the owner of the pond or lake for the conveyance of an easement or some other right of access to its waters.

For these reasons, we apply the common law rule to the present case. Therefore, to the extent the Colony is the fee simple owner of the pond bed, it has the exclusive right to the use of the surface waters above its property and may exclude all others from access to those waters.

### III. Land Boundaries and Damages

 The special referee declined to adjudicate the unsettled boundaries between the parties. There is at least some contradiction in the boundaries advanced between the Colony and the abutting landowners. In light of our determination that a mere abutting landowner does not have any right to use the pond, it is necessary to determine if they are simply abutting landowners or if they hold title to land that is covered by portions of the pond. If they hold title to portions of the bed of the pond, then those landowners have the right to use those portions of the pond immediately above their titled property. Similarly, they have the right to exclude others from those portions of the lake. *See generally South Carolina Elec. & Gas v. Hix,* 306 S.C. 173, 410 S.E.2d 582 (1991). They also have the right to cut down trees and brush over the land to which they have title. If, however, they do not have title to the land, the Colony can maintain its suit for trespass. *See Spigener v. Cooner,* 42 S.C.L. (8 Rich.) 301, 304–305 (1855)

Settlement of the boundaries between the various parties is not only necessary to delineate the respective rights of the landowners to use of the pond, but it is also essential for the establishment of damages. In declining to set the precise boundaries between the parties, the referee opted instead to utilize the term "overlap property." Such a vague description leaves unanswered the rights, if any, of the abutting property owners to use the pond and further renders the damage awards effectively unreviewable. We are compelled therefore to vacate the damage awards.

We remand to the trial court to determine the precise property lines of the owners of property abutting the pond. The trial court shall reconsider the matter of damages in light

of the true boundary lines. Damages, if any, should be ascertained on the existing record.[5]

## *CONCLUSION*

We find: (1) White's Mill Pond is not a publicly accessible navigable watercourse under South Carolina law; (2) the abutting landowners do not possess any littoral right of access to the pond; and (3) the question of damages cannot be determined absent a determination of the precise property boundaries. The order of the special referee is therefore affirmed in part, vacated in part and the case is remanded for a determination of boundaries and damages.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

HEARN, C.J., and HUFF, J., concur.

---

**5.** We recognize that additional evidence may be required, as deemed appropriate by the trial court, to clarify if an alleged trespass was committed upon property owned by the Colony. The taking of additional evidence is for clarification purposes only, not the expansion of the Colony's damage claims.